May it please the court, my name is Dale Schoenbert and I represent the appellants at Canyon Ferry Road Baptist Church and its pastor B.G. Stumberg. Your Honor, if I may, I'd like to reserve a couple minutes for rebuttal. The church should prevail here for, I think, at least three reasons. Montana's incidental political committee laws aren't narrowly tailored, they're vague, and the state's interest is in serious question because of how the law actually operates. The laws aren't narrowly tailored because Montana can't explain why it's necessary to require these groups that only incidentally speak in support of a ballot issue to jump through all the hoops of a political committee. Well, it doesn't jump through all. I think it does, Judge Canby. My understanding was that the incidental committee is treated differently from the others in less burdensome ways, but maybe you can explain if I'm wrong. There are different forms. All political committees fill out what's called a C2 form, and that requires basic information. You have to state who your treasurer is and disclose your primary bank, different organizational information like that. Incidental political committees then file what's called a C4 form. And ballot issue committees and other political committees, a ballot issue committee would fill out a C6 form. The difference in the forms is essentially a matter of white space. The commissioner's manual, I think, says it all. At ER 70, we discussed this in the reply brief at 20, he says, political committees of whatever sort must observe all campaign finance and practice laws, keep accurate records, and file necessary reports. And that's right after the incidental political committee description. And if you go through the statutes, the rules, the regulations, the requirements are all the same. These groups have to appoint a treasurer who's a registered voter, who has to keep track of all records of anything that could be an expenditure or an inferred expenditure in this case, because as we've noted in the briefs, this law is triggered by pure speech. I mean, there doesn't even have to be an actual expenditure. Did you try to keep your voice up just a little? Yes. Thank you. We have people in the audience who are straining for every word. My apology. I will do my best. So every regulation, the state hasn't pointed out any of the regulations that differ, that political committees, incidental political committees don't have to follow, except for the earmark. Incidental political committees only have to report what's considered an earmark contribution that they receive that's earmarked for the ballot issue committee. But that cuts against the law, not for it, because the law states that it could be expressly earmarked or impliedly. So the organization is left with trying to figure out what would be an implied earmarked contribution. For example, this Sunday evening service where the church had this battle for marriage, it was a simulcast on marriage and religious views of same-sex marriage and issues like that. The state has been pretty apparent that it considers that a political rally, even though it was a Sunday evening service. The district court recognized that it was a Sunday evening service. Does the church have to report all the contributions it receives that night as a mass collection or as an earmarked contribution? The commissioner couldn't answer that question, and frankly, the church can't either. And that's the second problem with this law. First of all, it's not nearly tailored because it requires – it really does require all of the – It would be hard to see that as earmarked. I mean, you pass a plate that you've done every Sunday night. Well, if you look at – at ER 218 and 219, the commissioner is talking about mass collections. And that's – the statute is Rule 44.10.521. It requires passing the hat. I mean, it mentions passing the hat specifically, that if this is an event to – Passing the hat for what, I guess? To support the ballot issue. If this was an event to support the ballot issue, then that's got to be reported. And the commissioner said that that may be the case at ER 218 and 219. He said that may very well be the case. And I think, you know, the state has, like I said, been clear that it considers this a political rally and not a church service. So it seems to me hard to imagine that that wouldn't have to be reported if that's what the state considers it. But there are a whole – you know, the church is in a difficult position here because we're talking about a small church. It's got a pastor, a youth pastor, and a part-time secretary. The pastor described it basically as a one-man show. And when he supports this ballot issue with, I mean, the most minute scintilla of support, he's got to wade through – navigate his way through these rules, the regulations, the sub-rules, the cross-references. He's got to go through a 40-page manual just to determine what he's got to do. And then the church has got an appointed treasurer who keeps track of all these records, has to appoint a treasurer, disclose their bank, their records are open, their accounts are open to any group that wants to observe them. The state's interest – and as this court mentioned in California Pro-Life Council, the state's interest here is singular. It's to inform voters of who supports the ballot issue. That could be met by a one-time simple disclosure law that requires this is who I am, this is what I spent, this is what I support. That's what has been upheld time and time again. But that's not what Montana does. It requires these groups to become and operate as political committees. It also lacks any clear monetary trigger. And that adds to the law's vagueness. I don't think any law that I've seen has done that except for North Carolina's, the one that the Fourth Circuit looked at in North Carolina v. Bartlett. It was a similar law to this. It captured incidental speech and then converted these groups into political committees. And the law said that was vague and overbroad, and the state cannot treat these groups that incidentally support the ballot issue as actual political committees. And that was the candidate election. And I think that's an important point in this case, too. Because in candidate elections, the state has more interest. It has interest in preventing and detecting fraud. It has interest in monitoring contribution limits and expenditure limits. Those aren't at issue in a ballot issue. And that's what this court recognizes in California Pro-Life Council. And when the state does this, puts these burdens on these small organizations, as the Supreme Court said in Massachusetts Citizens for Life, these detailed organizational recordkeeping and reporting requirements are too much for small groups like this church to bear. I mean, these community groups, they've got tons to do already. Their burden is to add this burden just to speak about a ballot issue. The state says it takes five minutes or so to fill these forms out. Well, filling the actual form out, maybe. But I think the burden goes way beyond just filling the actual form out. Just like doing your taxes, gathering information and complying with the law that takes the main burden. And so I think this law goes way beyond just the forms. And I think the second problem is that the law applies these regulations to groups whose major purpose is not elections. That's another issue the Fourth Circuit dealt with in North Carolina v. Leak recently. We submitted a 28-J letter. And that goes way back to Buckley. I mean, Buckley originally said that the law at issue in that case, which again applied only to Canada elections, but it had serious vagueness problems because, one, it didn't apply to express advocacy. And, two, it put these political committee regulations on groups whose major purpose wasn't candidates. And that's a huge burden, and it chills speech. It requires groups to try to, first of all in this case, figure out where the line is. And that line varies from commissioner to commissioner because they're not bound by previous commissioners' interpretations. And then jump through all these hoops. It's also interesting that in this case, I think the state's membership exception seriously undercuts its interest because here the church could have required each of its 400 members to sign this petition and incurred no legal obligation whatsoever. It also, but because it is open to the public, the service, like all of its services, Sunday evening services, or all of its services, period, are open to the public. Because of that, the membership exception is void, and it has to report to the state so that the state can inform the public of its support. And simply put, it encourages groups to do in secret what it punishes them for doing in public. Well, I suppose the state regards it as some sort of a concession to the, perhaps even free exercise or something, you know, the ability to communicate with your own members. Well, I think there are some constitutional reasons there, but I think... Of course it applies to other organizations, too. It does, and I think the problem is that it defines that exception so narrowly that it undercuts the state. Because if its interest is to inform the public of who supports the issue, as the state notes, the church was doing a fine job of that on its own. If it would have just stayed within its membership and told nobody, we're talking about six signatures. There were 98 signatures on these petitions. All but six of them were from church members. So if the church would have just kept to itself, it would have had to make no report whatsoever. Also, I want to address the issue that this information would... The information that the state cites wouldn't be available but for these laws. All the information the state cites comes from ballot issue committee reports. Ballot issue committees report every cent they receive. So if it's from an individual, it goes in one column. If it goes in... If it's from a group of two or more, whether it's a husband or wife or social service club or whoever, it goes automatically in the incidental political committee column. The state says that's usually how it finds out about these incidental political committees. Second, if I had known... Would any committee list what the church contributed in this case? No, it wouldn't. And that's... But... No, it wouldn't. And so it doesn't capture independent expenditures. But all the information that the state cites is from these ballot issue committee reports. And it's important to note that individual expenditures would never be captured because individuals can spend... An individual can spend a million dollars on a ballot issue. Well, somebody has to report that when they receive it. Yes, but if it's independent... If, let's say, a wealthy rancher wants to run ads for a particular issue, he can do that to his heart's content and not disclose a thing. And it'll never be disclosed unless it's to a ballot issue committee. And so there's a disconnect here where individuals can spend as much as they want without regulation, but a group of two or more spends a centilla. In fact, it doesn't even have to be an expenditure because, as you point out, that there was no expenditure in this case. The district court cited a $75, but that $75 for this simulcast was paid for by the Montana Southern Baptist Association, not the church. There was no payment. And this simulcast didn't involve CI-96 either. So there was no expenditure. It took the pastors... And drawing the line, I mean, you can see how difficult it is to draw these lines from the state's brief and the commissioner's decision. At page 6 of the state's brief, he says that... the church's overhead and the pastor's salary. But then at page 28, it retreats to the $75 fee. And it's a difficult thing to determine. I mean, if the state can't determine it, the commissioner can't determine it, the church certainly can't. And if it doesn't get it right, it could be subject to a complaint like it was here. It can wake up to a headline that it violated the law and go through a two-year ordeal. And that's really what happens in Montana with these laws. The amicus John Modell submitted a brief at tab 1, page 69, that it was the commissioner's decision where the commissioner found that John Modell and others, they filed these complaints against these groups to gain political advantage. If they can find technical violation of the law by these little groups, it gives them a headline, it gives them advantage. And so that's what they do. And that's certainly what happened in this case. The group, the opposition group... That complaint can be made against any kind of regulation of any kind of political activity. Yeah, but it's less likely if the law, if a law is, if the boundaries are precisely drawn, a group knows when they're triggered. There's a concrete value that triggers them. And then they have to just fill out a simple report. It's a lot less likely. I mean, there's a lot less fodder for groups to capture, to grab onto. And these groups know what they're dealing with. The state submitted to its 28-J response on this Fourth Circuit case the form that North Carolina used. I think that's a perfect example of a constitutional law. It has a $100 trigger that applies to concrete expenditures of value. And it applies to individuals and associations alike. And it's a simple reporting requirement. It's similar to what this Court approved in California Pro-Life Council. It doesn't require all the organizational hoops. It doesn't require the political committee, them to become and operate as a political committee. It's a simple requirement. It fulfills the state's informational interest fully. Does that ideal require an expenditure that is not overhead? In other words, I can imagine a corporation with a considerable plant maybe turning a whole building over to a campaign for months or a good part of a building and technically not giving any cash. But it sounds like an expenditure. Sure, and I'm not saying that in-kind expenditures would be prohibited. But even if you look at Montana's definition, it's got to be something of value, something normally bought, not sold, something of marketable value. And given to a political committee or a candidate. And there's an example in the briefs where University of Montana gave office space to an adjunct professor who was the proponent of a ballot issue. And this class that he taught was basically a lobbying class. And so the class went out and got signatures. Certainly that could be covered. There's something of marketable value that's given to the ballot issue committee. That's not what the case is here, though. This is a Sunday evening church service. It would have happened whether or not, regardless of what the topic was. And the pastor's salary, I mean, he was just speaking in support of a ballot issue. And then there are the petitions in the church. And the petitions in the church, those were brought in by a volunteer. Volunteers are accepted under the law. So that wasn't even a reportable expenditure in the first place. But the volunteer isn't providing the space in the church. No, but still there has to be some marketable value. And it's hard to determine what the marketable value is. And there ought to be some trigger here. And that's the problem. There's none. I mean, it's scintilla. And so I think the ‑‑ I understand that argument. Okay. In the secretary, she was working completely in her own capacity. They had the petitions out there like they have the sign up for Sunday school. Do you want to save some time? Yes, Your Honor. Thank you. Okay. May it please the court, Anthony Johnstone for Commissioner Dennis Unsworth in the state of Montana. Churches, like all organizations in Montana, are welcome to participate in the political process. There's no restriction on their participation. However, the church at issue triggered the disclosure requirements, the disclosure requirements that apply to all organizations that engage in campaign advocacy, by expending corporate resources to engage in express advocacy of a pending ballot issue toward the public and beyond the membership. The event was advertised on the radio. That triggers a short form disclosure for political committees. The definitions that apply to those triggers are modeled on federal law, and they are similar to or narrower than similar disclosure requirements that have been upheld by this court in the Alaska Right to Life case, the California Pro-Life Council, and others such as the North Carolina Right to Life cases. Incidental committees, as Judge Canby noted, do not have to comply with the full panoply of organizational regular reporting requirements and other requirements that the Supreme Court found suspect in Massachusetts Citizens for Life. The short form report, it can be filed one time. If you look at it, there's a check box there. You can check the record to support it. You can check this is an opening report and a closing report, and you're done. And the church would have been done five minutes after filling out. You have to read the statute. Everyone has to read every statute that's subject to a vagueness challenge and has to try to. Yeah, that's right. It's a pretty complex statute. Well, the statute at issue here is the same statute with the same trigger and the rules that every other campaign organization, whether it's in Montana under Montana law or under California's law, these statutes can be complicated. But the political campaigns that are in political business, they have to do it. But the church isn't in that business. I don't see how anybody could do this without hiring a lawyer. And I would assume a lawyer would charge you at least $1,000 to advise on what should you report. I can't understand that statute. And I would think you really have to be fairly deeply involved in election law precedence to know exactly what you had to do. I can't imagine just a pastor of a small church filling it out on his own. The form, Your Honor, is two pages. But you have to read the statute before you can fill out the form. The form isn't two pages. How many pages is the statute? The statute is extensive. How many pages? In terms of the code, there are probably five statutory provisions that issue a page each. The regulations that interpret in-kind expenditure and define an in-kind expenditure and define an incidental committee are each a page each. I looked at it. I think it's attached to your brief. It's really a very extensive regulation. I don't believe that anybody could maintain that could be conscientiously done without legal advice. But let me ask you, what is this information valuable for? It's filed with the state commission. What does the state commission do with it? The commissioner makes it available to the media. What does that mean, makes it available? It's a matter of public record so that organizations who want to know, and there's record evidence that during an election year, individuals and the media repeatedly come in and review the files. They are online now. And what do they learn? What do they learn from knowing about all these small contributors? They learn precisely who stands for and against the ballot issue. Why is it important to know that A, B, C, D, and E have each given $50? Well, I think the original California Pro-Life Council case explains that that's a compelling state interest because oftentimes the names of the official committees are confusing. No, $50. Why does that inform anybody that Joe Green has given $50?  It's a $50 gift by one individual. Why is that informative? Well, that is informative. And as an individual contribution to a campaign committee, it's informative because it tells you who their supporters are. All right, you know that Joe Green gave $50. What will that tell you as a voter in Montana? That will tell you that Joe Green And what will it mean to you, what will it mean to anybody? It depends. There's Joe Brown and so on. What does it tell you to have those names and those small amounts? Well, I think it's for the same reasons a $10 threshold was upheld by the Supreme Court in Buckley for individual contributions. Please don't give me a lot of cases. I'm just trying to inform myself. What do you think anybody does knowing that Joe Brown gave $10? Say you're in a community, a small state like Montana, a ballot issue campaign is relatively cheap, so you go and look, and both sides will go and look. You don't go and look. The media goes and looks. The only people that ever look at these things are the media and conceivably one of the big organizations. But are they going to print all these names? Do they do that? Do they print all the names of the small contributors? The newspaper does not print all the names of the small contributors. How else would you ever find it? Would anybody go to the files and find out that Jill and Joe and Jack had all given these small amounts? Yes. Amicus Common Cause, for example, goes to the files and looks at it. Oh, Amicus Common Cause, a big organization pushing something, of course will do it. But what do they learn? They learn that, you know, and there can be surprises as you look at this in terms of who's supporting it. And you may say, oh, well, this prominent figure is supporting it. They gave $50 to help it. What do I do with that information? You publicize it. Campaign literature routinely has long lists on the back of a brochure. These people support me. These are my endorsements. Well, if you want them to support you, they'll tell you. You know, I'm not familiar with a Montana ballot, but I am with a California ballot. The way I think most reasonable people know who's supporting what in California, they look at the names on the ballot, and it's somewhere between three and five names listed in the printed ballot. You get the idea. You don't need to know the names of a whole lot of small contributors. Really, I'm deeply suspicious of this, getting the names of these small individuals. It's the way, traditionally, that disfavored groups have been persecuted politically. In Montana, there is no requirement on the ballot that the proponents are listed. I see. Montana voters don't have that information. That would be an easy way to do it, but this way, of course it would be of interest if somebody gave $1,000 or $10,000, but to give $40, that's of interest to anybody? I think Montana voters do have that interest, because these are extraordinarily small campaigns. How will they know it? Because there's record evidence that people come in. You have to move from the record evidence to the evidence in your newspaper. Will the newspapers print that? They won't. It's a big gap. It's a silly scheme, if I may say so. I recall this was also a concern of yours in California Pro-Life Council after the remand, that this information was not getting out there. I think that the interest that the Supreme Court has recognized is not simply whether the newspaper publishes them, but whether other people, members of the community, can come into the office and look, and that is what happens in Montana. Well, you said it's online now. Sorry? You said it's online now? Yes, it is online, so you can go and see the committees. You can see all your neighbors made these small contributions. Well, I remember the question about whether California was going to get back up online, whether those contributions would be online, was an issue, and it's searchable to some extent. I don't think it's fully implemented. The point is that this disclosure is to get the information out to the voters. Now, the State can't disseminate it completely by itself. It has to make it public record, and then the institutions of civil society help to get it out there. But I think the other question then in terms of asking whether that interest is sufficient is really the standard of scrutiny, which I believe is an open question here. Because this is, as Judge Fletcher said in the Alaska Right to Life case, registration is not significantly burdensome. Now, the registration at issue in Alaska Right to Life was preregistration before you could even spend anything, and that was zero-dollar registration. If you intended to spend some amount of money in the future, you'd have to register, and that was upheld. Now, there was an exception in Alaska Right to Life for extremely small organizations. It was not invalidated in that case. I think it was something like $150 or $250 of annual revenues. The church has well over $100,000. At least you have Pastor Stumberg's salary. It's a much bigger organization. So there is a de minimis, but this case isn't that. Because that burden is... Did the church give any money to this issue? The church gave what has been recognized as an in-kind expenditure. So rather than... That's the paper and all that. But other than that, cash. No cash. As Judge Canby said, the church provided the space, and we see other churches, for example, reporting $50 for the use of the space to have a meeting. That space is something, and this was not a normal church service. Well, now, are there any other cases where a church has been labeled as a political committee? A church has been as an incidental political committee? Yes. Yes, there were six or seven churches this time around on both sides of the ballot issue. This time around, but before this time around. Before 2004. We did not have, as you see, there are enormous records here. We did not look back all the way before the electronic record keeping. But in the last few years, there was some evidence, nothing hard, that when a gambling ballot issue was at issue, that churches got involved in that. But in terms of... So why does that make a church a political committee? It doesn't make it a political committee under the laws. It makes it an incidental committee that has this single form. Incidental committee or incidental political committee. Because it engaged, it made the decision to go beyond its membership and go beyond issue advocacy about marriage and expressly endorse a pending ballot issue. That express advocacy line is clear and has been clear for more than 30 years. Once it did that, after inviting the public to come in, beyond its membership, it ran across the same trigger that the Chamber of Commerce or the Sierra Club would hit. How do we know that the church endorsed that ballot measure? Because, well, several, it stipulated that they endorsed C.I. 96 and that they used, in the old parlance, the magic words to support it, sign up. At Excerpts of Record 156, at Pastor Stumberg's deposition, he said he encouraged everyone to sign the petitions. If the church had made the decision to only play the simulcast and talk about marriage in general and talk about concerns about same-sex marriage, it would have been engaging in issue advocacy and would not be regulated under Montana law. Well, you know, churches have been involved in advocacy on political issues from the beginning of time, haven't they? I think that's true. So doesn't this interfere with the function of a church? I mean, you know, churches talk about social justice. Talk about caring for the poor and the homeless and the widowed and the orphaned and the sick and all that, the hungry. Those are all social issues, but they're also religious issues. The differences between being involved in politics generally and civil society generally, which has been, as you say, a historical function of the church and other organizations in civil society, and campaigning during a campaign, expressly endorsing a pending ballot issue, and that is a line that not many churches have chosen to cross because they've decided that either they can discuss it via the members or they have decided to discuss it as an issue. So the big problem here was that there were, what, six non-church members attended this sermon that was delivered on same-sex marriages? Your Honor, it was not a sermon. I think Judge Pastor Stumberg said that he wasn't preaching, just emceeing the event. Again, that's Excerpt for Record 156. It was not a normal church service. Well, they're always preaching, you know, so there's a whole lot. He returns a bit normally to that. But I think, now, there were six non-member signatures on there. Now, in retrospect, in this one case, does that go to the as-applied challenge? But I think that in terms of the law drawing a clear line, where that line was crossed, and, again, it's not a line of a punitive line, but just simply the line that you have to fill out the form was when they used their corporate status to get public service announcements. That's something that is not available to one individual, to announce the event and bring the public in. It happened that there were six. There might have been other members of the public who were there, but there were six members of the public who signed it. But that is where the line is. And if you read the commissioner's testimony in the regulations, that's how they fell outside of the membership exemption. Are you familiar with how the Civil Rights Movement of the 1960s was organized? Yes. How was it? Well, it was organized through the social justice movement. Do you know who were the organizers? Churches, to a large extent. Black churches. Yes. And I suppose they all would have had to register if they were in Montana. No, they wouldn't have. Why? Because they weren't campaigning for an active election. They would. Well, as I understand the history of the Civil Rights Movement, and that understanding is limited, again, the Civil Rights Movement came about through issue advocacy, and that's advocacy that's always been protected under the First Amendment and that you can't make people register for. It did not come about through express advocacy of particular campaign issues, a ballot issue. But if they supported a candidate for office, they would have been registered. If they supported a candidate for office, they were free to do so, but it might jeopardize their tax exemption. Well, you think this whole movement went on just in the air without individuals being supported for office? I have no doubt that you have more understanding of religious social movements than I would. So I'm not going to dispute that. Well, let me ask you a question. Tell us now exactly what the church should have reported. If you were advising, you were the lawyer they hired, what would you tell them to report? I would tell them to report at least the $75 cleaning fee. There is a $75 cleaning fee that anyone else who used the church for this space would have to. When does the cleaning fee come in? After the meeting? The policy of the church, yes. The policy of the church is that if a group wants to come in and use the church. Okay. Report that $75. It has to put down a $200 deposit and report the $75 cleaning fee, which is paid to an outside outfit, but in this instance that was a cost that the church didn't charge anyone. Now, there are questions about whether it may be higher. $75, I think, is the floor for purposes of the aside charge. Let's say the cleaning fee. What else? Well, I think beyond that there are they can report several steps about that. You're advising them. What do you tell them to report? I tell them to report the $75. That's it? It depends on whether to report the $200 deposit or not, but I think the $75. Will they give that back? Well, the other, if they give that back, yes, it would be the $75. And that is what you see, for example, the church in Billings reported, $50. Now, it doesn't have to report the value. If it finds it extraordinarily difficult to value that, the in-kind expenditure reporting regulation says that they can simply describe it. How about a pro rata value on the minister's time? I think the church could report that. The question is, and this is the- Do they have to? Is that what they're trying to get at? I don't think that in terms of the minister's time- You're advising them. Okay. I would advise them to report the $75 and put in the purpose that we held an event where the pastor spoke briefly about this following a long simulcast program that was paid for by someone else. Basically that we just held a one and a half hour event at the church with about 100 people and we usually charge some other group $75 to cover the costs of cleaning up after it. There was no such charge in this case. Now, that $75, it may seem small in California or even in Washington, but $75 as a value and 100 signatures as a value has a significant impact in Montana's low value retail campaigns. So I think in terms of the question about the vagueness, that is critical here that we not apply California $1,000 standards to Montana standards, which are much smaller campaigns. I think the way you get problems with vagueness, I suppose, is in the in-kind trigger, a one-cent in-kind contribution trigger. If there had been only the speech of the pastor saying, you know, this church supports the initiative and I urge you all to go sign it, that's campaign, I gather. That's First Amendment advocacy except that it's an expenditure by Montana standards because somebody is paying his salary for the two or three minutes that he speaks and somebody is paying some overhead on the church for that two or three minutes or something. That triggers it, doesn't it? I think that would because it's an expenditure. Now, again, it need not be boiled down to a particular amount. The regulations allow them to simply describe the event rather than trying to boil it down to amount. But I don't think there's a question that that is something that can be bought or sold at retail. They could have done this in a hotel room. They could have done it in another church where they would have had to pay, for example, the church in Billings a $50 fee. It is not a sort of de minimis expenditure, and there is a limit here. Anything of value has to be something that is not ordinarily given away for free. Now, we can see that when you look simply at a church event, well, that is something that is ordinarily given away for free, but that's not the question. The thing of value here is the space, and the space is not ordinarily given away for free. In Montana, as a general, in campaigns, and the record shows that, whether it's a fair booth or other churches. Q. So if you had a political campaign, say, in Montana, and, you know, one of the And there was a candidate running who was, say, one of the old Molly Maguires got up, and, you know, her grandson got up and wanted to take him back to those days, and it was a very controversial political issue, and if that person was given ten minutes to speak to the congregation, then the church would be required to fill out this form. In that instance, the church, that organization, that corporate body, would have had to have taken a position on it. If it was part of a candidate forum where it wasn't choosing sides, then it wouldn't trigger because it's not express advocacy in support of a ballot measure. If the church, however, brings in, and it's open to the public, in your situation, if they invite people from the public to come and they invite the candidate in, and it is the candidate, and they say, we want this person to come in and speak to you folks and give the campaign speech, if they provide that space, that would trigger filling out the form. But if they just limited the audience to the members of the congregation, that would be okay. That would be okay because the law recognizes that there's a difference between internal advocacy, organizations where people might generally be of the like mind, and then turning that advocacy outwards and trying to persuade other people. If they belong to a particular church, doesn't mean everyone there is of a like mind, does it? No, but in terms of a line to draw around the membership exception, there is refuge from the disclosure requirements. You simply belong to an organization as a member, and that's available to them here. Well, if someone brings their grandmother there who's not a member of the church, then that triggers it. The trick. One person who's not a member of the congregation. This church has very specific membership requirements which are detailed. I think where the law looks is whether you are soliciting the public to come in, and if just a member brings someone in, the church itself isn't engaging in express advocacy towards the public. There just happens to be a member of the public there. What if the members are invited to bring in other folks who are not members? If they were invited to come to church, no. If they were invited to attend an event in support of a ballot issue, then yes. So I think in both of these, and I know I'm well over my time, in both of these it's important to distinguish between the as-applied challenge, which the record shows is at least a $75 expenditure in express advocacy, and the over-breadth challenge, which they must meet a much higher standard of showing substantial over-breadth. I think what we've been talking about is the as-applied challenge, and there it just turns on whether that $75 at least value is too low a number, and I think the cases show that they aren't. We've certainly taken you over your time, but it shows the interest it has, and I really think you ought to realize the seriousness of this issue, at least something that seems to me quite an invasion of an area where the state shouldn't be sticking its nose. Well, thank you, Your Honor. I think we would appreciate some guidance. There are certainly some conflicting standards in this court on this issue. Thank you very much. Good answer. Just a few points briefly. I want to clear up the $75 figure. The pastor testified that they let any community group, anybody, use the church for free. Their cleaning crew has to come in for an extra trip, so the group has to pay the cleaning crew a $75 fee. This was a normal church service. There was no cleaning fee. There was no fee whatsoever. And even if there is, when the church lets groups use it, it goes to an outside group. Well, that wouldn't make a difference if the church forgave that payment one time. If it forgave it to an outside group? Yeah. See, we charge everybody $75 cleaning fee, but you, this ballot initiative committee can come in and use it, and we won't charge you this time. If that was to a ballot? It's paid to a cleaner. Sure, and if you look at the in-kind expenditure rule, it applies if you're giving it to a ballot issue committee. So if the church gives space to a ballot issue committee, and the ballot issue committee uses that for office space or whatever, sure, that's different, and I think that could be properly included. But that's obviously not what happened here. This was a normal Sunday evening church service. And what the standard comes down to, basically, is dial a commissioner. They've got to call the commissioner to find out where the line is. It's a confusing line, and I think that's evidenced by the fact that the state's done its best to describe the expenditure, but it's a very difficult thing to do. At page 6 of its brief, it includes the pastor's overhead and salary. For the church to be able to determine that line and then have a complaint being filed against it, which is likely in these contentious issues, because keep in mind that strict scrutiny applies here because they're important. This is what community groups, churches do. The church at ER 386, 387 describes its duty to discuss these issues. I mean, marriage is a social issue, but it's also a religious issue. It's incredibly important to its faith. Well, we've got a law that's applied pretty much to all kinds of different organizations. It's not singling out the churches. No, it's not. It applies to any group, and that's the problem. It's overbroad. It applies to any group that speaks on these issues at all, and that's the dampening of fact on First Amendment speech. I mean, that's especially in a ballot issue. Disclosure is one thing, and regulation of prohibition is another. It does seem that disclosure is treated a little bit differently in the cases than when there's a thing of value. Yes, and if this was mere disclosure after a thing of value, a triggering amount, we probably wouldn't be here. But this goes well beyond mere disclosure. The state has yet to describe a single difference in how incidental political committees are treated versus political committees. At our addendum, there are 55 pages. One-time thing is the one thing they mentioned. Well, yes, although I think any political committee could file a closing report if it just wants to speak one time. But here, if they want to have this discussion about it, they have to track every single inferred expenditure. So I think that applies to any political committee. But to survive strict scrutiny, the state simply cannot show that all these burdens are necessary to advance its informational interest. And the Supreme Court in Massachusetts Citizens for Life said it's not insurmountable. Sure, they could hire a lawyer, figure out how the law applies, go through the statutes and commissioner's manual and figure it out. They could do it. But it's a severe burden on speech, and that's why strict scrutiny is applicable here. And we're not saying, I want to be clear, that the Church is not saying that these laws can never be constitutional. Certainly not. Certainly they can. But they have to have a clear monetary trigger of something of value and apply a mere disclosure law, a simple disclosure law. This is who I am. This is who I support. This is a different question, but my recollection was that the invitation to the public for that Sunday night meeting did not mention the ballot initiative. That's correct. Is that correct? That's correct. The Church used public service announcements like it does any time. Did they come have a discussion about marriage or the threat to marriage or something? Yeah, it was this national simulcast that was happening. They got an e-mail from, I think it was Focus on the Family, who sponsored it. And it came up very quickly, so they didn't have time to. Who sponsored it? I think one of the sponsors was Focus on the Family. They had national religious groups that were engaged in this discussion. And it came up too quickly to put it in the Church calendar, so they made public service announcements, which obviously were free. And it didn't mention CI-96 at all. In fact, the person that attended the meeting, the Church service from the Montana Human Rights Network, said it was the last couple of minutes that CI-96 was even mentioned. So most of the discussion was over religious use of marriage, what to do in the wake of the Massachusetts Supreme Judicial Court's decision overturning that state's marriage laws, what impact that would have on churches, because this was a big deal for churches, since most of them perform weddings, and so it engendered a lot of discussion. But the bottom line here is Montana could meet its interest fully with a simple, one-time, one-page disclosure. The state's description of this law on page two to three of its brief takes up two pages, and that's the bare-bones description. A constitutional law in this case would take one sentence. After triggering a mount, the group disclosed who it is and what it spent. And that's what just about, I think, every court that's laid its pen to this issue has concluded, whether it's in a candidate context or especially in a ballot issue context. Professor, any questions? Thank you. All right. Thank you. And the court will recess until 9 a.m. tomorrow morning.
judges: Pregerson, Canby, Noonan